Page 136214 National Trust for Historic Preservation et al. v. Federal Highway Administration et al. Oral argument, 15 minutes for the plaintiff and 15 minutes to be shared by the defendants. Mr. Hickson for the appellant. Thank you. Good morning. Good morning, your honors. Just take a minute here, let everybody get settled. Also, let me find your brief. All right, you may proceed. Good morning, your honors. My name is Clarence Hickson. I'm representing the Coalition for the Advancement of Regional Transportation, which I'll refer to as CART. And your honors, if you will allow, I would like to reserve three minutes for rebuttal. Very well. Your honors, this case presents issues of alleged violations of the NEPA and CEQ regulations in the Louisville-Southern Indiana-Ohio River Bridges Project based in Louisville, Kentucky. This is a project which, in total cost for construction, well exceeds $1.5 billion. It's deemed by Federal Highway Administration to be a mega project. It has vast effects on the Jefferson County, where Metro Louisville is. And in respect to that, we presented in some of the circumstances and introduced proffered documents showing some of the circumstances in Louisville, Kentucky, in which Louisville, Kentucky and Jefferson County shows a striking race-segregated population composition with a majority of impoverished black population living in the Title VI area of West Louisville with some other Title VI areas. However, the selected modified preferred alternative that resulted from the NEPA process in this case produced a project that almost uniformly confers extraordinary benefits to the majority white population in the East County in Southern Indiana. The claims that we made in the court below and also all along in our comments to the NEPA process on behalf of CART and some of its members with their individual comments raised the same issues of NEPA violations and Title VI issues. The case below was particularly near and dear to the hearts of the Coalition of Advanced Center of Regional Transportation who had, for a long time, at least since the early 90s, been proponents of a light rail project. The primary issue regarding the minority community, the fact that this is a toll bridge and it would be economically difficult for the minorities to access the bridges, is that it as opposed to location? We would definitely argue not, Your Honor. CART's position on that is that the bridge proponents identified the affected corridors and they limited their discussion of Title VI impacts generally to 120 meters from the identified downtown bridge approach and corridors and the East End corridors so that their Title VI analysis presumed that only nearby and corridor adjacent populations were affected by their project. Whereas the vast size of the project and its vast cost, including 10 years of tolling fee collections, will have a disproportionate impact to the Title VI population, but the conferring of induced economic growth, which transportation projects are well known to do and which was an intent and plan of the purpose and need of the project to provide induced economic growth to the East County, the majority white East County. Those benefits also really left the West End of Louisville in a neglected state. Essentially, they say in the documents that there were no expected economic benefits or disbenefits to the West End of Louisville. It was as if they could not consider the needs for rational transportation planning for a community that had historically been the subject of oppressive racist discrimination all through the 50s until the Civil Rights Act of 1964 and so forth. So looking at the record, tell me what is the remedy that you seek? And I know you have a number of complaints and a number of questions here, but so what's the remedy that CART seeks? CART argued that it lost the T2 light rail project because states absorbed all of the available conventional funding sources by proposing a two bridges project and then proposing that it be funded by conventional funding sources, state and federal funding sources. That completely absorbed all available funding for the light rail project that was then an EIS procedure. So we have this under the Arlington Heights four-factor test. Here we have a procedure where a light rail line that would enter into the 14th Street West End area would also serve Smoketown, which was a traditional minority area. And all of a sudden in 2004, because of the signing of the record of decision and so forth, they have to announce there is no available funding for this process. What do we do about that now? I mean, you wanted the light rail. I guess that answers my first question. It's not the location, it's not the toll. I thought you had a complaint about the tolling, that that impacted the minority population because they had trouble paying the tolling. But you really want the light rail, but that's already been decided, I guess, and that's gone, and we can't reverse that, can we? Yes, Your Honor. Your Honor, you could provide the relief if you vacate the revised record of decision, even though the project has continued in the interim between the district court. We could stop this project, but we couldn't institute the light rail that you want. No, but as a result of the vacater of the revised record of decision, the appellees would have to go back and if you found NEPA violations and intentional discrimination under Title VI in the planning and proposals of the project that that intentionally discriminated against Title VI population, you could send it back for FHWA and the states to reconsider, and we could use the bridge piers that have been installed to do a cross-river light rail project if the states would take up that cause. But our problem... How would that benefit this black community? Because they do not have automobiles. Some 20% of the people in the West End are not able to afford automobiles. They have access to buses, don't they? They have access to buses, but there was no operational funds provided through the project, and the induced growth in economic benefits to the majority white population is produced over in some 10 miles away in southern Clark County in the River Ridge Industrial Park, which is this massive 7,000-acre booming area that has an Amazon factory and an Amazon distribution point and is creating jobs as a result of the induced growth from the cross-river linkage from the East End Bridge. I want to ask you... I didn't hear that. There are no buses that would go back and forth? They provided $20 million to purchase buses, but there were no operational funds for the drivers, the union drivers. TARC has funding issues, and we'll have to redeploy. Isn't that separate as to whether you have a bridge or not, whether you have the funds to operate a bus to go across the bridge? That would solve the problem if they had adequate busing. Is that it? No, Your Honor. I think that what we're looking for is finding what we sought in the court below was a trial on the Title VI issues, and we were denied that by summary dismissal. So our issue before this court is that that was error in the district court. And getting to that error, with respect to the NEPA claims, you contend that the district court abused its discretion when it refused to consider evidence that was not a part of the administrative record. So on what proof of bad faith do you rely for the proposition that the administrative record should have been supplemented with this evidence, much of which I assume you allege establishes this discrimination that is central to your case? And more importantly, why did you make no effort to add the administrative record, which I think is already over 100,000 pages, during that 14-year approval process leading up to, I guess, the development and the fruition of this project? Your Honor, what we did was we proffered documents and attached them to our pleadings in the district court. We also submitted extensive comments, especially on the Title VI issues, in the NEPA process to the agencies. And so the issues were put before them, and some of those issues came up and were before the court. Now, the bad faith issue has a lot to do with the fact that, in 2003, the appellees approved a project that was not fiscally constrained, that it was not affordable with available funds. And so FHWA actually approved a project that the states could not afford, and it was 10 years from 2003 until 2010 that the financing could be lined up to actually do the project. In that period of time, our T2 light rail system was killed for lack of funding. And also, in that period of time, they had $1.9 billion, as the records showed, that they could have built an east end bridge that would have drawn a lot of the congestion and cross-river traffic from downtown and essentially had almost the equal benefits of the modified selected alternative, the finally selected alternative. It compared quite favorably to that. And so it was arbitrary and capricious to insist on packaging two bridges in at the same period of time and going forward with them when there was no available funding for 10 years to do that. We did submit several documents that the court refused to consider that described the stark demographics of Jefferson County and supported Arlington Heights four-factor test as evidence of disparate impact. There were a lot of documents that were already in the vast record. We found upon later review that our Metro Housing Coalition race demographic data had already been submitted in the records which were in the administrative record, which were produced by Metro Housing Coalition during their comments to the conformity review for the local MPO. So at one point we didn't realize that the race demographic data had been submitted to the agencies and had been argued to the agencies in the conformity data. The other thing that we relied on heavily was the Title VI complaint made by Representative Wayne and Representative Bather, which is referred to often in the pleadings. And they, in 2002, February 2002, alleged and filed a Title VI intentional discrimination complaint along the same grounds that we have argued in the pleadings, which was that the needs of the West End had been completely ignored. The response of the agencies to that was to enter into a funny contract with the African American Heritage community. Did you say a funding or a funny? I said funny, and I meant to explain that, Judge. The reason was that one of the clauses in the contract said that if the Bridges Project were enjoined, then the $20 million promised to redevelop or rehabilitate the trolley barn as part of the deal with the African American Heritage Foundation the funding would be withdrawn if the project were enjoined. And this, we would argue, would be further evidence of discriminatory intent. They seemed to throw a sop to the Title VI complainants. And thereafter, the Title VI complaint did go away, at least as far as those same proponents. And so, looking at that. Was it the demographic data? I hear you say it was already in the record. So how would it be an abuse of discretion for the trial court not to admit that when you submitted it again? Well, really the abuse of discretion argument for the extra record evidence, because we didn't know it had already been submitted, we included it in the argument then. But prior to that, we had also talked about the Trinity Greenhouse Gas Inventory, which was performed for Metro Louisville government in 2008, and which made a quantitative analysis of greenhouse gas emissions from the city. So nothing to do with discrimination complaints? Not discrimination, no. But it was bad faith in, we allege, bad faith that the agencies did not, that they were aware of it because Air Pollution Control District, that they worked with on their conformity studies, was also a participant and used the same data to produce the greenhouse gas emissions. Is there evidence in the record about greenhouse gas emissions? No, that issue was not addressed by the agencies. They proposed a policy response rather than a hard look at greenhouse gas data. They had an expert study on greenhouse gas data that they could have and should have included in the public consultation and in the consideration of alternatives between transit or between mobile modes. So do your claims include environmental claims in addition to these type 6 claims? Judge, they do. We've gotten off because of the vastness of this project and the multiple claims. You're saying that there was nothing in the record about greenhouse gas? Not to the NEPA standards of a hard look at greenhouse gas emissions. And we did argue that extensively in the pleadings below and in the briefings. Was there additional evidence that was not in the record? Yes, we did. The Trinity Greenhouse Gas Inventory Study that was produced for Metro Louisville government. Is that the particular study you say that the trial judge improperly rejected? Yes. All right, fine. We did line out a list of excluded items that our claims rest on. That's helpful. You're way over your time. You've got three minutes for rebuttal. You can use it now or you can save it. I'll rest. Okay. We've got three defendants. Is there agreement to split time? Okay, great. Good morning still. Good morning, Your Honors. It is still morning. My name is Jennifer Newman, and I represent the federal defendants. My plan is to use about nine minutes of the time to talk about the NEPA issues and to reserve the remaining six minutes for Mr. Rensselman, who represents Kentucky, and he'll be speaking on behalf of the states. Also at counsel's table today is Mr. Furlow, who represents NDOT. He's not planning to speak, but if the court has any specific questions for NDOT, he's available to answer them. Thank you very much. NEPA is really a procedural statute, and it's designed to make sure that both the public and the decision makers are informed about the effects of a project. And here the Federal Highways Administration complied with all of the procedural requirements of NEPA in analyzing the effects of this project, and the district court appropriately found that they had done so and its ruling should be affirmed. CART, what it's really asking for is environmental analysis that the law simply does not require, and it also seems to be looking to impose substantive requirements on the project that are also nowhere required by the National Environmental Policy Act. My plan is to address the issues that Mr. Hickson brought up in his opening, and I'm going to start with the environmental justice issues, move on to light rail, the improper combining of the bridges in CART's view, and then finally I'll speak to the greenhouse gas inventory issue that Mr. Hickson brought up. But if there's other questions, I'm certainly happy to answer them. With respect to the environmental justice issues, CART's position seems to be that somehow a purpose of the project had to have been to improve the situation of the community in West Louisville. But the truth of the matter is that that's something that's not required when Highways is looking at approving a transportation project or not. Highways did what they were supposed to do, which was to look at the environmental effects of the project that was proposed by the states. It looked at a wide range of alternatives to that project, and one of the things that Mr. Hickson said was that nobody looked at the effects of the project  but that's actually not true. If you go back and look at the environmental impact statement and the supplemental environmental impact statement that was prepared when the tolling was added to the project, it's quite clear that they looked at the community in West Louisville and looked at not only would tolling affect them, which they did find there would be some adverse effect from the tolling itself, but also whether or not additional traffic would be pushed over into the West End since there would be an untold bridge over there, whether or not they would receive benefits from the project. They explained all of that in the environmental impact statement. And would they receive benefits from the project? Because CART says that there would be a burden but not a benefit, or there would be a disadvantage and no advantage for the West End. Right. There would be some advantage in the sense that the overall transportation system in the region would just move better, and they would of course have access to the bridges. It acknowledges, the EIS acknowledges that the tolling would impose a burden that would be more disproportionately in the same sense that you always, anytime there's a tax imposed, it's not dependent on income. It's borne more by folks with less income. And because of that tolling aspect, as Mr. Hickson recognized, there was a $20 million capital contribution paid to the local entity that runs the bus system to buy more buses and work on infrastructure and that sort of thing. And so that was meant to offset some of those impacts from the tolling to help them improve the bus system in the region. I'd like to move on, I think, to the light rail issue. I think the court has it exactly right that while CART would have preferred a light rail option, the agency looked at that as a potential alternative when it prepared the original EIS for the project and concluded that it would not contribute enough to make a meaningful difference in traffic in the area, and so it chose not to continue on with detailed study. And of course the court, while it could, if it found a violation of NEPA, order the agency to redo some of that NEPA analysis, it could not order the agency to require a light rail component to this transportation project. Another sort of consistent theme that CART continues to bring up is that there was some sort of improper combination of these bridge projects that they should have been analyzed separately. I think the thing to remember here with respect to that is that this really is a regional problem. It affects the entire metropolitan area, and both the states and the Federal Highway Administration decided that it made the most sense to look at all of these things together, and there was nothing in NEPA that prohibited from doing that. In fact, the regulations specifically provide that in a situation where there is common timing or geography for proposed projects, agencies can choose to analyze them together in a single environmental impact statement. The last issue I want to address is the greenhouse gas issue. It seems like at least as far as Mr. Hickson's argument here today, his primary concern was with this inventory of already existing emissions that were coming from the Louisville area and whether or not that should have been included in the administrative record. And as Judge Donald pointed out, there really is no evidence that the agency was improperly excluding that for any reason. There's no evidence of bad faith. There's no evidence that that information was necessary to understand CART's claims. And also, there's absolutely no evidence that the district court abused its discretion in excluding that material, and so that ruling should be affirmed. And I'll just say briefly on the greenhouse gas issues, you know, Highways did look at the greenhouse gas issues. It did not evaluate what the emissions would be from each alternative that it was looking at, but it did take a look at the greenhouse gas issue and decided that it would not provide meaningful information to the decision makers or to the public to go through that sort of detail and analysis with this particular project. And that conclusion was not arbitrary and capricious and is not a reason for reversing the district court. Unless there are further questions? Thank you. Thank you. Good morning. Good morning, Your Honors. Jason Renzelman. I'll be arguing on behalf of the states, addressing primarily the Title VI issue as that was alleged solely against the states. As an initial matter, Your Honors, CART has not demonstrated that it even has standing to pursue this claim. This court and the United States Supreme Court have both emphasized that the hard floor of Article III standing for an organization to assert claims is to show that it has one member with a concrete and particularized injury arising in relation to the claim. CART has not done so. It submitted an affidavit of one member, Mattie Jones, in support of its standing to allege the Title VI claim, but as the district court found, that affidavit does not allege that Ms. Jones herself would experience any kind of particular or specific injury resulting from the discrimination that CART seems to be claiming. It doesn't say anything about her use of the bridges. It doesn't say anything about her income, whether she suffers from any health effects or expects to, et cetera. So as a very preliminary matter, this claim can be disposed of on standing grounds. But beyond that, the district court properly found, and CART still seems to not be prepared to address the fact, that there is no evidence of any intentional discrimination. The law is very clear that a Title VI private right of action may only be brought on the basis of intentional discrimination, that is itself a determinative factor in resulting in some kind of exclusion or segregation against individuals on the basis of race, color, or national origin. CART's claims are all speculative, secondary effects that it believes may indirectly disadvantage the predominantly, or at least the more predominantly, minority West End of Louisville. It hasn't shown any evidence that that was an intent or a purpose of this project. Quite the contrary is true. Judge Donnell, as you pointed out, there's a 150,000 plus page administrative record that painstakingly details the legitimate non-discriminatory purposes that were to be served by this project to improve cross-river mobility, address compelling problems of highway safety, and improve transportation linkage, and in fact the evidence suggests that the project proponents went to great lengths to understand any impacts that might be had on the West End or any other area, any other Title VI census blocks in the Louisville metro area, and to ameliorate those to the extent possible. Thank you, Mr. Counsel. I won't be capable with that, but CART indicates that you have a high-density African-American population on the West End that in that population that this is, and they argue and they give some examples of how this is going to affect them disproportionately. One thing that concerns me and gives me pause, he talks about there being evidence of basically an attempt to sort of buy off opposition to this by offering money and saying, if there is opposition, this money that we have offered to give you for a certain project, and if there's an injunction, this is going to go away. That seems somehow, it's very troubling, and I think it's troubling largely for me because of, you know, this kind of, I guess, historical evidence, I guess, that's not in this case, but that's just sort of out there. How should the court look at that? Well, Your Honor, I think CART is making more of that provision than can legitimately be made. The reason that the funding wouldn't be available if the project were enjoined is because the funds come from the project. If FHWA is precluded from expending federal funds on the Bridges Project, those monies simply wouldn't be there. It wasn't from a separate source, and they're saying we're going to pull this back. And CART also says that one of the things that supposedly supports this lack of discrimination is that there was money set aside to provide additional buses to give this population that doesn't have, you know, individual transportation modules, but then before somewhere down the line, there is no money to get people to operate the buses. Is there any truth to that? Your Honor, I believe that some of that results from statutory limitations on what funds can be expended for. Part of the issue here is you have federal highway funds that are being expended on transit services, which falls under the auspices of the Federal Transit Authority. So I think some of that relates to the specifics of sort of the statutory authorization for use of funds from the various agencies. But more to the point, the commitment of funds for transit services was meant to be as part of the NEPA process, a mitigation effort. It was in no way a concession that there was some nefarious discriminatory motive here. You know, the reason that the bridge is being built on the east end is because there is no bridge there,  there is a bridge, an untold interstate bridge that does service the west end. The fact of the matter is, the result of this project is, there's $20 million more in capital funds available to improve transit services that was not available there. I think, Your Honor, also a lot of the facts that CART is alluding to about restrictions on operational funds and union drivers are things that aren't in the record that we haven't seen presented before this court and certainly not before the district court. But certainly that wouldn't suggest that the purpose of building the bridges itself was invidiously discriminatory. Your Honor, I see my time has expired unless there are any further questions. All right, thank you, Counsel. Mr. Hickson, you've got three minutes rebuttal. Thank you, Your Honor. Your Honor, AR-293730 and AR-293731 is the basis in the record for the allegation about the trolley barn. And it just says, new and existing retail businesses that complement the cultural arts will be encouraged to locate it in the rehabilitated trolley barn. KYTC has indicated that third-party agreements implementing the craftsman and rehabilitation of the trolley barn will include a provision that notes that if the project is enjoined, all aspects of the project will be put on hold. As such, it is hoped the entire community will see that they are being benefited by timely implementation of the project. This consensus will hopefully minimize the potential cost escalation if the project were delayed. The standing argument we addressed extensively in our pleadings, and we believe contrary to what my esteemed friend said, we did indicate in the pleadings that there would be no operational funds for the TARP buses. Our argument about the combination of the projects was not whether or not you could include in the same EIS impacts that might occur, significant impacts that might occur in some other location because of the installation of one bridge or another. The argument that we made in the pleadings was that it included consideration of reasonable alternatives for each site. In other words, they created a two-site purpose and need statement and then screened alternatives unreasonably against a two-site purpose and need statement. If you have a two-site purpose and need statement, you must suggest two projects to satisfy each site. You can't just propose a single downtown cross-river light rail project, which incidentally would have a far expanded feeder bus system than what the $20 million thing is proposed to be the benefit presently. Throughout this project, though, weren't there extensive opportunities for notice and hearings and comments and objections and all of that from all of the affected areas? Yes, Your Honor, and I'm sorry to say, and we've said in the pleadings, that we felt that it was a sham process because the states, Kentucky and Indiana, had implemented a contractual agreement to build two bridges and their approaches defining the duties of each state prior to entering upon the NEPA process. It's a clear violation of the pre-selection of the outcome before the significant impacts were even considered, and we've offered that consistently in the pleadings. Any further questions at this time? Thank you, Your Honor. All right, thank you, Mr. Hicks. It's my understanding that the remaining cases on today's docket will be submitted on the briefs. All right, with that, you may adjourn the court.